UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ST. TAMMANY PARISH HOSPITAL SERVICE DISTRICT NO. 1, D/B/A/ ST. TAMMANY PARISH HOSPITAL<br><br>     Plaintiff,<br><br>  VERSUS<br><br>TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA<br><br>     Defendant. | CIVIL ACTION<br><br>NO. 07-1065<br><br>SECTION "C", MAGISTRATE 4<br><br>JUDGE BERRIGAN<br><br>MAGISTRATE ROBY |

## OPPOSITION TO MOTION FOR SANCTIONS

  **NOW INTO COURT**, comes Plaintiff, St. Tammany Parish Hospital Service District No. 1, d/b/a St. Tammany Parish Hospital (the "Hospital), who submits the following response to the Motion For Sanctions Arising Out of Plaintiff's Expert's Spoliation of Evidence filed by Travelers Property Casualty Company of America ("Travelers").

## I.  INTRODUCTION

  This is not a case of bad faith spoliation of evidence. Over a year ago, the Hospital provided Travelers the documentation necessary for it to evaluate and understand the adjustments made by the Hospital in presenting its claim. Indeed, Travelers' original expert, Dan

Wright, acknowledged receipt of the documentation but he never evaluated or analyzed it before Travelers terminated his services.

Rather than truly trying to understand the Hospital's claim and the reason for the adjustments to the Hospital's interim monthly financial statements, Travelers has been attacking the Hospital and its representatives. Not being satisfied with these unrelenting attacks, Travelers is now attacking the Hospital's expert – Christopher Brophy, of Ernst & Young, L.L.P. ("Ernst & Young") – by accusing him of deliberately destroying what Traveler's asserts is "critical evidence." Travelers claims that "critical evidence" has been destroyed because Mr. Brophy did not retain brief notes of an October 2007 meeting or drafts of his report. Travelers made this attack without any warning to the Hospital's counsel.[1] As with its other attacks, Travelers' most recent campaign falls woefully short of its mark.

The simple truth is that Mr. Brophy has not discarded "critical evidence;" nor has he acted in bad faith, which is the standard for sanctions in the Fifth Circuit. Indeed, Travelers

---

[1] Before bringing its motion for sanctions, Travelers did not attempt to discuss the issues raised in the motion with the Hospital's counsel. Because the issues raised are, essentially, discovery issues, Travelers should have invoked a conference pursuant to Local Rule 37.1 before bringing its motion. If Travelers' motion is more appropriately considered a motion for sanctions pursuant to Rule 11, Travelers was required to provide notice to the Hospital and a reasonable opportunity to respond before filing its motion. In either instance, if the Hospital prevails in opposing Travelers' motion, it is entitled to an award of attorneys' fees and expenses incurred in preparing its opposition. *See Larkin v. United States Dept. of the Navy*, 2002 WL 31427319 at *3 (E.D. La. 10/25/02) (Roby, Magistrate) (awarding reasonable expenses incurred in responding to motion filed without compliance with Local Rule 37.1 and without good cause or substantial justification); *see generally Chambers v. Nasco, Inc.*, 501 U.S. 32, 50, 111 S. Ct. 2123, 2135-36, 115 L. Ed. 2d 27 (1991) (holding district court has inherent power to sanction bad faith conduct, even if specific statutes or rules apply).

does note cite or acknowledge the Fifth Circuit's bad faith standard. Travelers also does not allege that Mr. Brophy acted in bad faith. This alone is grounds for denial of Travelers' motion.[2] Furthermore, there is no evidence that Mr. Brophy discarded in bad faith the sketchy notes of the October 22, 2007 meeting he had with the Hospital's Controller, Sandra DiPietro, his assistant Brad McCloskey, and the Hospital's counsel. Indeed, Mr. Brophy testified that he discarded the notes in accordance with his standard practice, after he incorporated into his report the thoughts contained in the notes.[3]

The notes Mr. Brophy discarded – which Mr. Brophy testified were "some pretty basic notes" – also are not evidence of the accounting "flaw" that Travelers now bases its defense upon.[4] Nor are they evidence explaining why the Hospital's monthly financial statements for

---

[2] "Only upon a showing of 'bad faith' or 'bad conduct' does the Fifth Circuit permit an adverse inference against the destroyer of evidence." *Transcontinental Gas Pipeline Corp. v. Societe D'Exploitation Section Du Soliraire, S.A., et al.*, 2007 WL 2712936 at * 5 (E.D. La. 9/13/07) (Berrigan, J.) (citing *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005) (holding "spoliation claim is without merit" when there is no evidence of bad faith)).

[3] See Exhibit 1, Brophy Deposition at 34:15-19.

[4] This "flaw" that Travelers attempts to make so much of has been explained to Travelers time and again. In the immediate aftermath of the storm, the lack of communications prevented the Hospital's patient accounting system from communicating with its services provider. As a result, the financial accounting system did not have complete or accurate information for the period of interruption, particularly as to the timing of services. Complete information was later entered manually into the accounting systems, and this corrected daily financial data forms the basis for the Hospital's claim. The Hospital notified Travelers of this problem in its November 16, 2006 response to Travelers' denial of its claim, explaining to Travelers the billing problems and stating: "[f]or this reason, Travelers' reliance on the unaudited monthly income statements for August, September, and October 2005 for actual net revenue is flawed. The Ernst & Young report calculates

*(continued on next page)*

912858v.1

August and September 2005 are not the best foundation for calculating the Hospital's lost revenue during the claim period (which is August 29, 2005 until September 30, 2005). Further, these basic notes were not related to the adjustments to the Hospital's monthly financial statements that were necessitated by the accounting system disruption caused by Hurricane Katrina. The relevant *evidence* is contained in the testimony of Mr. Brophy, Ms. DiPietro, and other Hospital executives and employees, as well as in the Hospital's actual detailed financial records. Travelers has had the opportunity to depose those individuals and has been provided the documentation necessary to understand the Hospital's claim, including the "flaw."

Moreover, notes of Mr. Brophy's meeting with Ms. DiPietro, Mr. McCloskey and the Hospital's counsel exist in the form of far more detailed handwritten notes taken by Mr. McCloskey. These notes were just recently discovered and will be submitted for *in camera* review if the Court so desires. Mr. Brophy did not consider these notes in preparing his November 2007 expert report. The Hospital asserts these notes are privileged and are not subject to discovery. The Hospital also asserts that Rule 26(a) does not require production of an expert's notes.

---

lost net revenue properly through reliance on daily patient data for the period of loss." *See* November 16, 2006 W. Treeby letter to Travelers at p. 4 and n.1, attached hereto as Exhibit 2. Travelers was provided with the corrected data and information necessary to understand the adjustments on January 9, 2007. Rather than acknowledging that this issue has been explained and corrected, Travelers has instead attempted to seize upon this understandable storm-related adjustment to attack the Hospital and to detract from the Hospital's legitimate claim. *See also* discussion *infra* at Section II.A.1 for more factual detail concerning this issue.

912858v.1

Travelers' allegation of spoliation based upon Mr. Brophy's alleged destruction of drafts of his report borders on the absurd. There are no drafts of Mr. Brophy's report because – as he testified – he did not generate any paper copies until the report was complete. Instead, he wrote his report on his computer and made edits to it as he went along, without saving each edit as a separate document.[5] In other words, he overwrote each "iteration" of the report until it was completed. There is no requirement in any law (or in common sense) for an expert to preserve each edit made in an expert report as it is being drafted.

Mr. Brophy did not in bad faith destroy any evidence, much less any "critical" evidence. Had Travelers first contacted counsel about its professed concern about Mr. Brophy's notes, Mr. McCloskey's notes would have been discovered and a normal discovery dispute would have ensued over their discoverability. Instead, Travelers has brought this Motion for Sanctions with no factual or legal basis. In doing so, it has wasted the time of this Court and caused the Hospital to incur substantial fees and costs. For this reason, Travelers should be sanctioned and ordered to pay the Hospital's attorneys' fees and costs incurred in the preparation of this opposition.

## II.    LAW AND ARGUMENT

### A.    No Sanctions Are Warranted Because Mr. Brophy Did Not Destroy Critical Evidence In Bad Faith

The cornerstone of Travelers' motion is that Mr. Brophy deliberately destroyed his notes and drafts in order to deny Travelers access to this purportedly critical evidence. First and foremost, because Travelers does not allege that Mr. Brophy acted in bad faith, its motion

---

[5]    *See* Exhibit 1, Brophy Deposition at 13:4-14:3.

912858v.1

fails on that basis alone. In addition, the evidence establishes that Mr. Brophy did not act in bad faith. It is Mr. Brophy's usual practice to discard his notes after any thoughts contained in them are incorporated into his report. Therefore, under controlling Fifth Circuit precedent, there is no basis for the imposition of sanctions. Moreover, the notes that Mr. Brophy discarded are not evidence of the "flaw" or the necessary adjustments to the Hospital's financial records. Therefore, there is no spoliation of evidence. Furthermore, far more detailed notes of Mr. Brophy's meeting exist, although the Hospital contends that none of the experts' notes are discoverable.

1. **Mr. Brophy's Notes Are Not Evidence Of the "Flaw" or the Necessary Adjustments to the Hospital's Financial Records**

According to Travelers, it needs Mr. Brophy's notes to be able to understand the "flaw" in the Hospital's financials and to thereby defend the Hospital's claim. First of all, the "flaw" (which is a word used by undersigned counsel in drafting their demand on the Hospital's behalf) was discovered and disclosed to Travelers more than eleven months prior to the creation of the discarded "pretty basic" notes that Travelers now contends are "critical" evidence. What is this "flaw" in the financials? As noted previously, because the Hospital's computer billing system was down for the first 15 days following Hurricane Katrina, the Hospital was unable to enter patient charges into the billing system during that time period, as is normal, on an hour-by-hour, service-by-service basis. Instead, the Hospital staff manually recorded the charges, and when the computer billing system came back up in mid-September, all the manually recorded charges were entered on one day. In part, this caused the September 2005 financial statement to

912858v.1

overstate the income for that month and the August 2005 statement to understate the income.[6] In addition, contractual adjustments, critical to a proper calculation of the loss, were estimated for the September 2005 financial statement and were later adjusted upon discovery that the estimate failed to approximate actual performance for the period.

As Mr. Brophy and Ms. DiPietro testified in their depositions, these accounting issues were discovered during the preparation of Mr. Brophy's initial claim analysis provided to Travelers' on November 16, 2006. Ms. DiPietro then appropriately reallocated the charges on a daily basis for the days in August and September 2005 when the billing system was down due to Katrina.[7] She also calculated the actual contractual percentage adjustment for the claim period using actual payment data for the period, to provide a more accurate estimate of the Hospital's losses.[8] Mr. Brophy properly relied upon these adjustments to the Hospital's financials to calculate the claim in November 2006 when he prepared his initial analysis and again when he prepared his expert report for this litigation. Travelers was given both the initial analysis in November 2006, and the expert report in November 2007, together with the underlying support. By doing so, Mr. Brophy accurately calculated, and correctly reported, the Hospital's insured loss.

---

[6]   *See* Exhibit 3, DiPietro Deposition at 63:4-67:8.

[7]   *See* Exhibit 3, DiPietro Deposition at 103:15-105:12; *see also* Exhibit 1, Brophy Deposition at 14:21-15:7.

[8]   *See* Exhibit 1, Brophy Deposition at 59:4-21; *see also* Exhibit 3, DiPietro Deposition at 69:6-11.

912858v.1

Obviously, "critical evidence" as to the "flaw" and how these adjustments were made, as well as how Mr. Brophy used them to calculate the Hospital's loss, is in the testimony of Mr. Brophy and Ms. DiPietro. More importantly, it is in the actual financial records of the Hospital. It is not contained in Mr. Brophy's "pretty basic" notes of the October 22, 2007 meeting he had with Ms. DiPietro and counsel, eleven months after his initial analysis was provided to Travelers in November 2006. On November 16, 2006, Travelers was put on notice of the understandable problem in the Hospital's monthly financial statements for August and September 2005. Travelers has had the detailed financial information necessary to understand the accounting discrepancy, the necessary adjustments, and how the Hospital's claim was calculated by Mr. Brophy since January 9, 2007, when the Hospital put Mr. Brophy's then colleague, Larry Smith,[9] directly in touch with Travelers' then expert, Mr. Wright. Mr. Wright admitted receiving the financial information (which was everything Mr. Smith and Mr. Brophy had considered in calculating the claim), but then he did nothing with it.[10] Travelers has claimed repeatedly it needs more financial information in order to understand the Hospital's claim and defend against it – and the Hospital has provided all that has been requested – but the fact is that Travelers has had all the information it needs since January 2007. More importantly, Mr. Brophy's discarded "pretty basic" notes are not evidence of how the "flaw" came about, nor are

---

[9]     Mr. Smith subsequently left Ernst & Young and is now working for another company in the New Orleans area.

[10]    *See* Exhibit 4, Wright Deposition at 289:18-21; 292:6-14. Shortly after his receipt of this information, Travelers apparently dismissed Mr. Wright and retained a new expert, for reasons that were not disclosed in depositions.

912858v.1

they evidence of the adjustments based on actual daily revenue and actual contractual adjustments that were necessary for an accurate calculation of the Hospital's loss.

## 2. Mr. Brophy's Notes Are Not Discoverable

While the Fifth Circuit has not ruled on the issue of whether an expert's notes are discoverable, the Eastern District of Louisiana as well as other circuits and district courts have addressed the issue and hold that they need not be produced.

In *Kiln Underwriting Ltd., et al. v. Jesuit High School of New Orleans*, 2008 WL 108787 (E.D. La. 1/9/08) (Roby, Magistrate), the Court held that notes that included attorney work-product were not discoverable. In *Kiln*, the plaintiff, was an insurance company that had issued a policy providing for business interruption insurance to the defendant school.[11] As part of the adjustment process, Kiln hired Custard Insurance Adjusters to assist with the School's claim. Subsequent to the filing of the claim, a dispute arose between the parties regarding coverage, and litigation ensued. During the course of discovery, the school filed a subpoena *duces tecum* seeking, among others, documents held by Custard.[12] The plaintiff sought a protective order, or in the alternative, a motion to quash the subpoena.

Included in the documents sought by the school were emails that "speak of strategy, recommendations, and opinions shared between the experts, counsel for the Plaintiffs, and the adjuster, as well as the notes and letters regarding the opinions as to the cause of the

---

[11]    *Kiln*, 2008 WL 108787 at *1.

[12]    *Id.*

912858v.1

damage."[13] The court found that "[t]hese documents are therefore protected by the work product doctrine . . . ."[14]

*Kiln* is squarely on point with this case. Both Mr. Brophy's discarded "basic" notes and Mr. McCloskey's notes encompass discussions on October 22, 2007 among the experts, Ms. DiPietro and the Hospital's counsel regarding counsel's mental impressions of the case, the theory of damages, and strategy in presentation of the claim. Moreover, this material was not just prepared in anticipation of litigation, it was created after litigation had already ensued. Pursuant to *Kiln*, these notes are protected work product. Thus, because the notes are not subject to discovery, Travelers has not been deprived of anything and has not been prejudiced by Mr. Brophy's actions.

Moreover, other courts have held that notes like those at issue here are not subject to discovery, basing their decisions on Federal Rules of Civil Procedure 26(a), rather than on work-product protection. In *Gillespie v. Sears, Roebuck, Co.* 386 F.3d 21 (1st Cir. 2004), the plaintiff had sought the defendant's expert's notes relating to the testing of allegedly defective saws. The district court had ordered production of "all relevant evidence," but Sears did not produce the expert's notes, instead producing an excerpt of a video in which the saws were tested.[15] Because of Sears' failure to do so, the district court ordered a mid-trial deposition of the expert on the subject of the notes and allowed testimony related to the notes to be admitted at

---

[13]     *Id.* at *8.

[14]     *Id.*

[15]     *Gillespie*, 386 F.3d. at 34.

912858v.1

trial.[16]  On appeal, Sears argued that this was improper and prejudicial.  The First Circuit found

no reversible error based on the mid-trial deposition.  It did, however, conclude that there was no

reason to produce the notes:

> [Plaintiff] claims that this expert discovery rule itself required the working notes
> because it requires a report stating the expert's opinions and reasoning and "the
> data or other information considered by the witness in forming the opinions." Fed.
> R. Civ. P. 26(a)(2)(B). But this language does not require that the expert report
> contain, or be accompanied by, all working notes or recordings, nor does it appear
> that even [Plaintiff's] expert . . . so construed it.

*Gillespie* 386 F.3d at 34-35.  *See also McDonald v. Sun Oil Co.*, 423 F. Supp. 2d 1114, 1122 (D.

Or. 2006) ("Rule 26 requires the disclosure of an expert's identity, a handwritten report

containing a statement of all opinions and the basis for those opinions, and the data considered

by the expert in forming the opinion.  This rule does not require the production of an expert's

working notes."); *Cook v. Rockwell Intern. Corp.*, 2006 WL 3533049 at *41 (D. Colo. 12/07/06)

("Rule 26(a)(2)'s requirements that the expert's report include his opinions and reasoning and 'the

data or other information considered by the witness in forming the opinions' do not, however,

require that the expert report contain, or be accompanied by, all of the expert's working notes or

recordings.").

These authorities establish that Mr. Brophy's notes are not discoverable.  *Kiln*

provides that notes containing counsel's impressions of the case, the theory of damages, and

strategy in presentation of the claim are protected work product, while *Gillespie*, *McDonald*, and

*Cook* make clear that Mr. Brophy's notes are not subject to discovery pursuant to Rule 26(a).

---

[16]  *Id.* at 34.

912858v.1

Therefore, his discarding them is meaningless. Neither he nor the Hospital was obligated to provide the notes to Travelers.[17]

### 3. Sanctions Are Not Warranted Because Travelers Has Not Shown Mr. Brophy Acted In Bad Faith

#### a. Travelers Fails to Satisfy the Fifth Circuit's Bad Faith Standard

Even if the notes were discoverable, which they are not, Mr. Brophy did not discard them in bad faith in order to deny Travelers' use of them, and Travelers has not alleged that he did so in bad faith. To the contrary, Mr. Brophy's deposition testimony shows that he followed his normal practices when preparing an expert report. Before discussing that testimony, it is important that Travelers' misstatements as to the law of spoliation be addressed.

Travelers repeatedly uses the terms "deliberate," "not-negligent," and "non-negligence" in its motion, insinuating that something short of bad faith is the critical inquiry.[18] This, however, patently is *not* the standard of the Fifth Circuit, and Travelers' attempt to play fast and loose with controlling precedent cannot change the law. In the Fifth Circuit, the moving

---

[17]  While not binding on this Court, it is noteworthy that the Louisiana Code of Civil Procedure affirmatively makes an expert's notes subject to work product privilege. *See* La. Code Civ .P. 1425(E)(1) ("The *expert's drafts of a report* required under Paragraph B of this Article, and communication, *including notes* and electronically stored information or portions thereof that would reveal the mental impressions, opinions, or trial strategy of the attorney for the party who has retained the expert to testify, *shall not be discoverable* except, in either case, on a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts or opinions on the same subject by other means.") (emphases provided).

[18]  *See* Rec. Doc. 76-2 at 6.

- 12 -

party has the burden of showing **bad faith**.[19] *See Condrey v. Sun Trust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005); *Caparotta v. Entergy Corp.*, 168 F.3d 754, 756-57 (5th Cir. 1999); *Transcontinental Gas Pipeline Corp. v. Societe D'Exploitation Section Du Soliraire, S.A., et al.*, 2007 WL 2712936 at * 5 (E.D. La. 9/13/07) (Berrigan, J.); *Anderson v. Production Management Corp., et al.*, 2000 WL 492095 (E.D. La. 4/25/00) (Clement, J.). Travelers' failure to mention the proper standard is telling.

In fact, Travelers cites in its memorandum the seminal Fifth Circuit case on spoliation but attempts to twist the language to avoid the clear holding – that there must be a showing of bad faith.[20] In *Vick v. Texas Employment Commission*, 514 F.2d 734 (5th Cir. 1975), the defendant had destroyed physical records relating to Ms. Vick's unemployment pursuant to a policy of destroying "inactive records." Plaintiff contended that because of this destruction an adverse inference should have been created by the district court; the Fifth Circuit disagreed and found no reversible error.[21] The *Vick* court's reasoning is critical here and shows exactly how Travelers is attempting to mislead the Court as to the applicable law. Travelers states that *Vick*

---

[19]     Furthermore, though no sanction is warranted in this case, the Hospital notes that in the Fifth Circuit, the appropriate sanction for spoliation is an adverse inference, not disqualification of the expert.

[20]     Travelers also cites *Anderson*, but again ignores the court's clear recognition that the Fifth Circuit requires a showing of bad faith before a claim of spoliation will result in the sanction of an adverse inference. 2000 WL 492095 at *3.

[21]     514 F.2d at 737.

912858v.1

"permit[ed] adverse inference where evidence is destroyed non-negligently."[22]  The Fifth Circuit

said no such thing.  Instead it found:

> The adverse inference to be drawn from destruction of records is predicated on
> *bad conduct* of the defendant.  Moreover, the circumstances of the act must
> manifest *bad faith*.  Mere negligence is not enough for it does not sustain an
> inference of consciousness of a weak case.

514 F.2d at 737 (citing McCormick on Evidence § 271) (emphasis provided) (internal quotations

omitted).

Travelers also cites *Caparotta v. Entergy Corp.*, 168 F.3d 754 (5th Cir. 1999), to

support its proposition that sanctions are warranted for intentional, deliberate, or "non-negligent"

spoliation.[23]  *Caparotta*, however, underscores that the critical inquiry is whether evidence was

destroyed in bad faith.  *Id.* at 756 (finding the spoliation doctrine does not apply in the absence of

bad faith).  There is no bad faith here, just as there was not in *Caparotta*.[24]

The Hospital long ago provided Travelers with large amounts of financial

information that fully supports its damage claim.  Thus, Travelers has not been deprived of actual

evidence supporting the Hospital's claim.  Moreover, Travelers has already deposed Mr. Brophy

regarding the creation, drafting and analysis of his expert report, as well as his factual

---

[22]  *See* Rec. Doc. 76-2 at 6.

[23]  *See* Record Doc. 76-2 at 6.

[24]  In *Caparotta*, the destruction of the records was inadvertent, there was no bad faith, and
plaintiff was not entitled to an adverse inference instruction.  168 F.3d at 756.
Nonetheless, the district court allowed admission of the evidence pursuant to Federal
Rule of Evidence 403.  *Id.*  The Fifth Circuit reversed, finding that the lower court abused
its discretion in allowing loss of the evidence to go before the jury because "the danger of
unfair prejudice and confusion of the issues was substantial."  *Id.* at 758.

- 14 -

investigation of the claim. The notes that Mr. Brophy discarded dealt with conversations among the expert, Ms. DiPietro and the Hospital's counsel on October 22, 2007, just prior to the submission of the expert report on November 23, 2007. Travelers has deposed Ms. DiPietro and had the opportunity to ask Ms. DiPietro about her meetings with Mr. Brophy. Thus, Travelers' statements about the importance of these "basic notes" is misleading. If Travelers wished to determine when the Hospital realized that its financial information was allocated incorrectly, it could have asked during any of the number of depositions of Hospital executives it has taken, all of which were taken *after* Mr. Brophy's deposition and the revelation that he discarded these "basic notes." Travelers, in fact, did ask questions about the billing services problems during the aftermath of the storm.[25] Travelers, however, chose not to ask about when the Hospital first became aware of the "flaw." Of course it is obvious that this occurred prior to November 16, 2006, eleven months before the meeting at which Mr. Brophy's "pretty basic" notes were taken. Travelers cannot assert on one hand that Mr. Brophy's notes are critical, and on the other fail to delve into the facts contained in those notes and the circumstances in which the notes were taken.

By ignoring the Fifth Circuit standard and attempting to rewrite the law to suit its purpose, Travelers seeks to avoid its failure to allege bad faith or to provide any evidence that Mr. Brophy acted in bad faith. Travelers does so because there is none. Travelers has affirmatively accused Mr. Brophy of a serious ethical breach that goes to the heart of his credibility and has provided *no evidence at all* that Mr. Brophy acted with wrongful intent or desire to hide damaging information. Travelers' allegations are baseless and serve to do nothing

---

[25]     *See* Exhibit 3, DiPietro Deposition at 71:12-73:15.

912858v.1

more than harass the Hospital and distract the Court from the real issue in this case – Travelers' bad faith in refusing to pay the Hospital's claim.

### b. The Evidence Shows Mr. Brophy Did Not Act in Bad Faith

Travelers' effort to mislead the Court does not stop with the law. In its motion, Travelers cites to the following testimony of Mr. Brophy, related to a meeting that took place on October 22, 2007, as to the alleged deliberate destruction of his notes:

Q. Do you recall taking any notes?

A. I would say that I did take some pretty basic notes.

Q. And then you threw them away afterwards?

A. Yes.

Q. With whom were the conversations for which you took those now discarded notes?

A. Primarily with Sandra DiPietro. We were looking to understand some of the aspects of the claim.

Q. And she explained aspects to you, is that correct?

A. We had questions for her which she answered, yes.

Q. And you took notes with respect to her answers, is that correct?

A. Some, yes.[26]

Travelers, however, left out the following testimony regarding Mr. Brophy's notes:

Q. Why did you throw away your notes?

A. I don't typically retain notes unless I have a particular reason to. I incorporated it in my analysis and didn't feel a need to retain it.

---

[26] *See* Exhibit 1, Brophy deposition at 33:8-25.

912858v.1

Q. When you say your analysis, that means the report itself?

A. Yes.[27]

Mr. Brophy's testimony makes clear that he did not in bad faith destroy his notes. Rather, he discarded them in accordance with his standard practice. Following one's typical pattern or practice and throwing away notes most assuredly is *not* bad faith. *See Russell v. University of Texas of the Permian Basin*, 234 Fed. Appx. 195, 208 (5th Cir. 2007) (holding that "[t]ypically we do not draw an inference of bad faith when documents are destroyed under a routine policy," even if they were destroyed after the initiation of litigation). Mr. Brophy's testimony makes abundantly clear that under the controlling Fifth Circuit authority, no sanction is warranted for Mr. Brophy's actions.

### 4. Notes Of The Meeting Exist Anyway

As Mr. Brophy testified, he incorporated the material from his "pretty basic notes" of the October 22, 2007 meeting into his report and then discarded the notes.[28] Mr. Brophy's completed expert report was provided to Travelers on November 23, 2007. It was only after this, on November 28th, that Travelers first asked for Mr. Brophy's "work papers."[29] Thereafter, the Hospital's counsel asked Travelers specifically to define "work papers" so that the Hospital could ensure that all responsive information had been produced.[30] Travelers responded on January 2,

---

[27]      *See* Exhibit 1, Brophy Deposition at 34:15-22.

[28]      *See* Exhibit 1, Brophy Deposition at 34:15-22.

[29]      *See* Exhibit 5, correspondence from S. Ahmad to W. Treeby, November 28, 2007.

[30]      *See* Exhibit 6, Email from W. Treeby to S. Ahmad, January 2, 2008, at 4:39 p.m.

912858v.1

2008, defining "work papers" to include, among other items, Mr. Brophy's notes.[31] After receiving this definition, counsel for the Hospital inquired of Mr. Brophy if he had any notes; Mr. Brophy indicated he did not. During his deposition, Mr. Brophy was asked not only about his notes, but also the notes of his assistant, Brad McCloskey.[32] Mr. Brophy stated that he had asked Mr. McCloskey about notes, but he did not recall if Mr. McCloskey took any notes, or if Mr. McCloskey did not have any notes.[33] Based on this testimony, it is obvious that Mr. Brophy did not consider Mr. McCloskey's notes in preparing his November 2007 expert report.

In connection with preparing this opposition, counsel asked whether *any* notes existed, kept by anyone at Ernst & Young, and for the first time learned that Mr. McCloskey did take, and had maintained, notes of the October 22, 2007 meeting, even though Mr. Brophy did not retain his "pretty basic" notes of that meeting. Mr. McCloskey's notes reflect primarily attorney work-product in the form of counsel's mental impressions of the case, the theory of damages, and strategy in presentation of the claim, interwoven with some notes of discussions with Ms. DiPietro. Because of the Hospital's position that its expert's notes are not discoverable, the notes have not been filed with this memorandum but will be made available for *in camera* inspection if the Court so desires.

Had Travelers simply asked the Hospital to double check for anyone's notes after Mr. Brophy's deposition, Mr. McCloskey's notes would have been discovered and a normal

---

[31]   *See* Exhibit 6, Email from S. Ahmad to W. Treeby, January 2, 2008, at 3:57 p.m.

[32]   *See* Exhibit 1, Brophy Deposition at 34:8-14.

[33]   *Id.*

912858v.1

discovery dispute would have ensued. Instead, Travelers has fired off its unfounded motion for sanctions. For this reason, Travelers should be sanctioned by being ordered to pay the Hospital's attorneys' fees and costs associated with preparing this opposition.

### B. No Drafts Were Destroyed Because There Were No Drafts

Travelers also asserts that Mr. Brophy improperly destroyed drafts of his expert report. Interestingly, Travelers did not quote or cite to any testimony of Mr. Brophy relating to the drafts. Travelers did not do so because the testimony is clear that there were no drafts – Mr. Brophy simply overwrote each "iteration" of the report on his computer until it was completed:

Q. Did you keep or maintain any of the prior drafts or iterations of the claim as you described it?

A. The only one that we kept was the one that was provided to Dan Wright at Kriegstein, to my recollection, and then of course the final claim is part of the expert report.

Q. What did you do with the other iterations of the report as you described it?

A. We just didn't save them. We save the new version onto the old version.

Q. You discarded the old versions; is that correct?

A. Yeah. Yes.

Q. Why did you do that?

A. That's a normal procedure for us. We don't maintain many iterations. We develop the claim, we come up with a – you know, in that case of the Wright report a preliminary claim, and then that's updated claim. There's no reason to save the previous versions.[34]

No matter how many times Travelers says Mr. Brophy destroyed drafts of his report, the simple fact remains that no "drafts" of his expert ever existed because, in accordance with his normal

---

[34]     *See* Exhibit 1, Brophy deposition at 13:4-24.

912858v.1

practice, he overwrote each iteration on his computer.[35] And, Travelers cites no authority for the proposition that it is improper for an expert to overwrite previous iterations of his report and not save them.

Not only is Travelers' argument about Mr. Brophy's alleged destruction of draft reports unwarranted by the facts, it is also unsupported by the cases on which Travelers relies. Travelers cites *Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277 (E.D.Va. 2001), stating that it is "identical" to this case. *Trigon*, however, is far from identical and does not support Travelers' argument. First, the *Trigon* court noted that it was *not* deciding the issue of whether an expert is required to retain "drafts prepared solely by that expert while formulating the proper language in which to articulate that expert's own, ultimate opinion arrived at by the expert's own work, or those working at the expert's personal direction."[36] In fact, the court noted "[t]here are cogent reasons to militate against such a requirement . . . ."[37] This is the precise situation at issue here – Mr. Brophy simply overwrote prior iterations of his work as he formulated his opinions.

---

[35]    In fact, there was very little difference between Mr. Brophy's initial report of November 2006 and his expert report of November 2007, in terms of methodology or the calculated claim amount. The preliminary claim dated November 16, 2006 totaled $4,586,000 (before application of the $500,000 deductible). The claim submitted in the November 23, 2007 expert report totaled $4,648,211 (before the deductible). The difference is $62,211, a small amount overall. Travelers did not question Mr. Brophy about this difference in his deposition. Both figures are *projections* of lost revenue less actual revenue.

[36]    *Trigon*, 204 F.R.D. at 283 n.8.

[37]    *Id.* Although not controlling, it is illustrative to note that in 2006 the ABA House of Delegates recommended that state and federal discovery rules be amended to prohibit the discovery of draft expert reports and attorney-expert communications. The Committee

*(continued on next page)*

912858v.1

Second, and more importantly, in *Trigon* there was a clear finding of bad faith on facts unique to that case, something that Travelers has not shown here. In *Trigon*, there was an accusation that the consulting experts had ghost-written reports of the testifying experts, and that as written, the reports were not truly the opinions of the testifying expert.[38] In fact, a document had been recovered that contained the "remarkable directive" to the expert "PLEASE DO NOT WORK ON THE END OF YOUR REPORT YET BECAUSE WE ARE DOING SO."[39] This document had been deleted as part of the retention policy but was later recovered via computer forensics. The *Trigon* court believed that this retention policy was more of a deletion policy:

> [T]he rather obvious effect, and perhaps even the purpose, of [defendant's] retention policy was to eliminate this source of undeniably meaningful cross-examination resource about the substance of the expert opinions and about the ghost writing of the opinions.

*Trigon*, 204 F.R.D. at 290.

---

on Rules of Practice and Procedure of the Judicial Conference of the United States has adopted this recommendation and has stated that it is the recommendation of the Subcommittee that drafts not be discoverable and notes of an expert that also contain attorney work-product be placed off limits as well. Courts in the Eastern District have also placed drafts off limits. The Honorable Stanwood Duval has affirmatively stated in the *In Re Katrina Canal Breaches Consolidated Litigation* that "[d]rafts of class certification expert reports are considered protected work product and shall not be discoverable or admissible for any purpose including impeachment." *See In Re Katrina Canal Breaches Consolidated Litigation*, USDC, Eastern District of Louisiana, No. 2:05-cv-04182, Rec. Doc. 3299 at 17, an except of which is attached hereto as Exhibit 7. In addition, Louisiana Code of Civil Procedure article 1425(E)(1) provides that drafts of expert reports generally are not discoverable. *See supra* note 17.

[38] *Trigon*, 204 F.R.D. at 291.

[39] *Id.* at 290 (capitalization in original).

912858v.1

Here, there is no accusation that the Hospital's counsel, or anyone else, ghost-wrote Mr. Brophy's report and that the drafts would demonstrate the ghost writing. As Mr. Brophy made clear, while he talked with the Hospital's counsel during the process of formulating his opinions, he formed his opinions and created the report independently.[40] Therefore, despite Travelers' contentions, this case is not "identical" to *Trigon* and is in fact not even similar. Moreover, in *Trigon* these draft reports were absolutely critical pieces of evidence for which there could be no substitute, because the critical inquiry was not the substance of the reports, but rather who created the reports. Such is not the case in this litigation. Travelers deposed Mr. Brophy and had full opportunity to question him about his report. Travelers deposed the Hospital's officers and its Controller, Ms. DiPietro, and had opportunity to question them about the content of the report, their communication with Mr. Brophy, and the "flaw" in the Hospital's accounting records caused by Katrina service interruptions. Travelers also has the financial records necessary to understand the Hospital's claim. There is absolutely no parallel between *Trigon* and this case. There has been no spoliation or ghost-writing here. Sanctions, except sanctions against Travelers for frivolously filing this motion, are not justified factually or legally.

## III.  CONCLUSION

For the foregoing reasons, the Court should deny Travelers' motion. The Court should also sanction Travelers for bringing its unfounded motion by awarding the Hospital attorneys' fees and costs incurred in connection with preparation of this opposition.

Dated: February 26, 2008

---

[40]  *See* Exhibit 1, Brophy Deposition at 17:18-18:19.

912858v.1

Respectfully submitted,

*/s Paul J. Masinter*
William D. Treeby, 12901
Paul J. Masinter, 18324
Kathryn M. Knight, 28641
    Of
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Telephone: (504) 581-3200

Attorneys for St. Tammany Parish Hospital
Service District No. 1, d/b/a St. Tammany
Parish Hospital

# C E R T I F I C A T E

I hereby certify that a copy of the foregoing has been served upon each counsel of
record by CM/ECF and/or by United States mail (for those counsel not registered with
CM/ECF), on this 26th day of February, 2008.

*/s Paul J. Masinter*

912858v.1